**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Newark Division**

Aaron Mizrahi (AM7030)
Direct Dial 973.486.4972
Direct Facsimile 973.358.5853
amizrahi@mizrahiwarren.com

**MIZRAHI WARREN LLP**
*Attorneys for Plaintiff Cheryl Mercer*
The Centre at Park Avenue
523 Park Avenue, Third Floor
Orange, New Jersey 07050
Telephone 973.685.5444
Facsimile 973.685.3936

---

| | | |
|---|---|---|
| CHERYL MERCER, | : | Case No. |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| HH GLOBAL LIMITED; HH ASSOCIATES | : | Jury Trial: ☒ Yes ☐ No |
| LIMITED; HH ASSOCIATES U.S. INC.; | : | |
| SANOFI S.A.; SANOFI-AVENTIS U.S. LLC; | : | |
| SANOFI US SERVICES INC.; MICHAEL DEVANY; | : | |
| and, LINDA TAMBURELLO-AGAR, | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

---

**Complaint and Demand for Jury Trial**

Plaintiff Cheryl Mercer, hereby states by way of Complaint against Defendants HH Global

Limited, HH Associates Limited, HH Associates LLC, HH Associates U.S. Inc., Sanofi S.A., Sanofi-

Aventis U.S. LLC, Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar, as follows:

**Nature of Action**

This action arises from damages Plaintiff suffered as a result of: Defendants' alleged violations

of 29 U.S.C. § 623, 42 U.S.C. § 2000e-2 and the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-

1 *et seq.*; Defendants' alleged violations of the New Jersey Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 *et seq.*; and other supplemental common law and statutory causes of action.

## Jurisdiction & Venue

1.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over Plaintiff's claims under 29 U.S.C. § 623 and 42 U.S.C. § 2000e-2.

2.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims under the laws of the State of New Jersey and common law claims, as they form part of the same case or controversy arising from those claims that are within the Court's original jurisdiction.

3.      Pursuant to 28 U.S.C. § 1391, venue is properly laid before this Court, as the events or omissions giving rise to Plaintiff's claims occurred within the State of New Jersey.

## Parties

4.      Plaintiff Cheryl Mercer ("Mercer") is an individual citizen of the United States and of the State of New Jersey, who resides at 8 Mercer Avenue, in the Borough of Chatham, County of Morris, State of New Jersey.

5.      At all times relevant hereto, Mercer was an employee and, now, a former employee of Defendants HH Global Limited, HH Associates Limited and HH Associates U.S. Inc., as well as a former independent contractor for Defendants Sanofi S.A., Sanofi-Aventis U.S. LLC and Sanofi US Services Inc.

6.      Defendant HH Global Limited is a private limited company organized and registered under the laws of England and Wales in the United Kingdom, which maintains registered and executive offices at Grove House on Guildford Road in the Village of Fetcham, Town of Leatherhead, District of Mole Valley, County of Surrey, England.

7.      At all times relevant hereto, Defendant HH Global Limited was and is the non-trading holding/parent company of Defendants HH Associates Limited and HH Associates U.S. Inc.

mizrahiwarren

8.     Defendant HH Associates Limited is a private limited company organized and registered under the laws of England and Wales in the United Kingdom, which maintains registered and executive offices at Grove House on Guildford Road in the Village of Fetcham, Town of Leatherhead, District of Mole Valley, County of Surrey, England.   Upon information and belief, Defendant HH Associates Limited also maintains a registered and/or executive office at 415 Madison Avenue, 14th Floor, in the City and County of New York, State of New York.

9.     At all times relevant hereto, Defendant HH Associates Limited was and is a wholly-owned subsidiary of Defendant HH Global Limited and the trading parent company of Defendant HH Associates U.S. Inc.

10.     Defendant HH Associates U.S. Inc. is a corporation organized under the laws of the State of Delaware, which maintains a registered office at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, State of Delaware, and executive offices at 175 East Hawthorn Parkway, Suite 325, in the Village of Vernon Hills, County of Lake, State of Illinois.  Upon information and belief, Defendant HH Associates U.S. Inc. also maintains executive offices at 260 Kearny Street, 4th Floor, in the City and County of San Francisco, State of California.

11.     At all times relevant hereto, Defendant HH Associates U.S. Inc. (together with HH Global Limited and HH Associates Limited, "HH Global") was and is a wholly-owned subsidiary and the United States division of Defendants HH Global Limited and HH Associates Limited.

12.     Defendant Sanofi S.A. is a *société anonyme* or anonymous company (*i.e.*, a public limited company) organized and registered under the laws of the French Republic, which maintains registered and executive offices at 54 Rue La Boétie, in the City of Paris, Métropole du Grand Paris, Île-de-France, French Republic.

13.     At all times relevant hereto, Defendant Sanofi S.A. was and is the parent company of Defendants Sanofi-Aventis U.S. LLC and Sanofi US Services Inc.

mizrahiwarren™

14.     Defendant Sanofi-Aventis U.S. LLC is a limited liability company organized under the laws of the State of Delaware, which maintains a registered office at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, State of Delaware, and executive offices at 55 Corporate Drive, in the Township of Bridgewater, County of Somerset, State of New Jersey.

15.     At all times relevant hereto, Defendant Sanofi-Aventis U.S. LLC was and is a wholly-owned subsidiary and one of Defendant Sanofi S.A.'s United States operating divisions.

16.     Defendant Sanofi US Services Inc. is a corporation organized under the laws of the State of Delaware, which maintains a registered office at 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, State of Delaware, and executive offices at 55 Corporate Drive, in the Township of Bridgewater, County of Somerset, State of New Jersey.

17.     At all times relevant hereto, Defendant Sanofi US Services Inc. (together with Sanofi S.A. and Sanofi-Aventis U.S. LLC, "Sanofi") was and is a wholly-owned subsidiary and one of Defendant Sanofi S.A.'s United States operating divisions.

18.     Defendant Michael Devany ("Devany") is an individual citizen of the United States and of the State of New York, whose last known address is 8 Maria Lane, in the City of Yonkers, County of Westchester, State of New York.

19.     At all times relevant hereto, Devany was an employee and, now, a former employee of HH Global, and was Mercer's direct supervisor during her employment at HH Global.

20.     Defendant Linda Tamburello-Agar ("Tamburello-Agar") is an individual citizen of the United States and of the State of New Jersey, whose last known address is 34 Vanessa Lane, in the Borough of Ringwood, County of Passaic, State of New Jersey.

21.     At all times relevant hereto, Tamburello-Agar was and is an employee of Sanofi and, after Sanofi outsourced print procurement services to HH Global, was responsible for overseeing HH Global's work for Sanofi.

2006.001_MWLLP-21-4842 v1.0

**Facts Common to All Counts**

22.   In or around 2012, Mercer began working with Sanofi as an independent Print Production Specialist, managing advertising/marketing print procurement and production for various Sanofi brands on-site at Sanofi's headquarters in Bridgewater, New Jersey.

23.   While working as a Print Production Specialist, Mercer reported directly to Sanofi's then-Director of Marketing Operations and then-Senior Manager of Marketing Operations.

24.   During this time, Mercer developed strong working relationships and good-will with Sanofi employees, including Sanofi's own marketing team leaders, and quickly became known as a "go-to" resource for all print procurement needs for the Sanofi brands and divisions that she managed. Indeed, her 6-month contract with Sanofi was extended 6 times based upon her exceptional performance.

25.   At some point in 2014, Sanofi's then-Director of Marketing Operations and then-Senior Manager of Marketing Operations left the company, and Tamburello-Agar was named as Senior Manager of Marketing Operations.

26.   Also around that time, Sanofi decided to eliminate its team of print procurement professionals--all of whom, including Mercer, were independent contractors--and outsource print procurement services to a single company that could employ an on-site team to provide those services.

27.   As Sanofi's Senior Manager of Marketing Operations, Tamburello-Agar was assigned the task of identifying and recommending an organization to provide these outsourced services, which took approximately 1 year.

28.   Upon information and belief, Tamburello-Agar selected and/or recommended HH Global to provide the outsourced services based upon HH Global's promise or guarantee of a substantial cost-savings and, as a result, Sanofi awarded the contract to HH Global.

29.     Based upon Mercer's outstanding performance as an independent Print Production Specialist, and that she became a valued partner to Sanofi's marketing team and brand managers, Sanofi's then-Director of Marketing Operations and then-Senior Manager of Marketing Operations enthusiastically encouraged HH Global to hire Mercer as its on-site Senior Production Manager.

30.     HH Global was slated to begin services to Sanofi in mid-2015.

31.     Upon information and belief, Tamburello-Agar also became the liaison between Sanofi and HH Global.

32.     Prior to HH Global beginning work under its contract with Sanofi, while Mercer was an independent Print Procurement Specialist, she never reported to Tamburello-Agar.

33.     In an offer letter dated June 5, 2015 ("Offer Letter"), HH Global offered Mercer the Senior Production Manager position, at a monthly salary of $7,083.33 ($85,000.00 annually).

34.     HH Global also offered Mercer full health benefits, including major medical, dental and vision benefits, as well as disability and life insurance, participation in HH Global's 401(k) plan, 16 days of paid vacation leave, 10 paid holidays and 1 floating holiday.

35.     Although the Offer Letter stated that Mercer would be an at-will employee, she was also required to sign an employment agreement ("Employment Agreement") as a condition of her employment.

36.     The Employment Agreement provided that Mercer was prohibited in perpetuity from disclosing non-public information she was given access to during her employment with HH Global, including, "know-how, trade secrets, customer lists, policies, operational methods, any information relating to the products, processes, customers and services and other business and financial affairs of [HH Global] and its affiliates … ."

37.     The Employment Agreement further provided that, for a period of 12 months following any termination of her employment with HH Global, Mercer was prohibited from becoming, "associated

with any entity, whether as principal, partner, employee, consultant or shareholder … that engages in … an activity that is in competition with a business and/or service that [HH Global] provided or planned to provide while [Mercer] was employed by [HH Global] … [including] employment by a client either directly or indirectly."

38.     Mercer accepted the terms of the Offer Letter and Employment Agreement, and her first day of employment with HH Global (at Sanofi) was on July 1, 2015.

39.     As part of HH Global's on-boarding process for Sanofi, Mercer and all other HH Global employees were required to participate in Sanofi's Code of Ethics and Human Resources policy training, which included subjects such as workplace harassment and compliance reporting procedures.

40.     HH Global's on-site team at Sanofi--working from Sanofi's headquarters in Bridgewater, New Jersey--was led by Devany, who was the Client Services Manager.

41.     Mercer and all other HH Global employees reported directly to Devany.

42.      Almost immediately after HH Global took over Sanofi's print procurement operations, Devany introduced a confrontational culture within the ranks of HH Global's on-site team, as well as Sanofi's marketing department.

43.     Particularly, Devany singled out female employees, including Mercer, by applying his own arbitrary standards to only their work, and by intimidating and bullying them on a daily basis.

44.     His verbal denigrations permeated conference calls and meetings with HH Global and Sanofi representatives, and often escalated to explosions of physical rage and assault during personal encounters in the office (*e.g.*, slamming fists on tables and desks, throwing objects, etc.).

45.     Devany's hostilities also affected other HH Global employees who did not work on-site at Sanofi, one of whom, April Beugesse ("Beugesse"), even expressed her fear of encountering Devany to Mercer, and stated her hope that she would never have to face him in person.

mizrahiwarren

46. Indeed, Devany became so untamed that Mercer and her female co-workers at HH Global began fearing for their own safeties both in and out of the workplace; and, for many of these individuals, the resulting anxiety manifested into serious health concerns.

47. Devany's conduct extended to 2 female Sanofi employees as well, Linda Szych ("Szych") and Afrodite Lewnes ("Lewnes")--who he described as "physically scary and unappealing women"--subjecting them to constant verbal denigrations and allowing them to witness his physically-aggressive outbursts day-after-day.

48. Mercer attempted to address these issues with Devany directly on several occasions, advising him that his conduct was alarming and made her uncomfortable, but he quickly dismissed her concerns.

49. Instead, Devany made his misogynistic predilections clear and laughingly told Mercer that he "loved" how his particularly abusive behavior upset Szych during a meeting that had just concluded, and also stated that he enjoyed "berating and confronting" others.

50. Devany also criticized Mercer for being "too nice" to a female Sanofi employee, telling Mercer that she was acting like she was a hostage and the other woman was "enslaving" her.

51. It became clear that Mercer could "do no right" according to Devany and that he would find some way to yell at and berate her no matter the situation.

52. Knowing from her training that Sanofi could intervene, Mercer met with Tamburello-Agar to report Devany's conduct, specifically requesting that Sanofi intervene before Devany became any worse.

53. Refusing to involve herself, however, Tamburello-Agar told Mercer to address the issue with HH Global directly, further stating that she (*i.e.*, Tamburello-Agar) could do nothing because she had no authority over HH Global personnel.

mizrahiwarren.

54.     Tamburello-Agar also stated to Mercer that she was aware of Devany's abusive behavior through reports made to her by Szych and Lewnes, and that "if [she] could get rid of HH Global, [she] would".

55.     Nonetheless, neither Tamburello-Agar nor anyone else at Sanofi intervened on Mercer's behalf, or on behalf of Szych and Lewnes.

56.     In the meantime, Devany's physically intimidating conduct intensified even further.

57.     Discouraged by Sanofi's refusal to address the ongoing harassment, even for its own employees, Mercer and her co-workers also feared that if they contacted HH Global's human resources department, it would only anger Devany more.

58.     However, on July 15, 2015, Devany called Mercer into a conference room for the sole purpose of yelling at her and putting her down (without any real basis), and when Mercer expressed confusion as to what Devany was upset about, he became enraged and began pounding his fists on the table and stomping his feet.  When Devany rose and leaned toward Mercer (who was still seated) in a physically menacing manner.  Mercer quickly left the room in order to avoid being assaulted by Devany.

59.     It was at this point that Mercer decided that involving HH Global's human resources department was unavoidable, and immediately contacted HH Global's Human Resources Manager Erica Berman ("Berman") and Human Resources Generalist Katie Suastegui ("Suastegui"), both of whom promised to investigate the issue further.

60.     Apparently, during Mercer's conference call with Berman and Suastegui, Devany called Berman, seemingly, to head off any complaint Mercer would make to them about him.

61.     Mercer's HH Global co-worker, Barbara Kohn ("Kohn"), joined Mercer in voicing her complaints regarding Devany's behavior.

2006.001_MWLLP-21-4842 v1.0

62.    On or about September 11, 2015, after Devany was especially abusive to Kohn during a Friday telephone status conference with other HH Global employees (who were not on-site at Sanofi), she was so upset and scared by his behavior that she left the building.

63.    Upon information and belief, Kohn also called Tamburello-Agar to report Devany's conduct and to advise her that she left the building.

64.    Devany called both Mercer and Kohn that afternoon and left messages demanding that they return his call before leaving for the weekend, however, both Mercer and Kohn feared further abuse during that call and did not call Devany back.

65.    The following Monday, September 14, 2015, Devany summoned Mercer and Kohn to meet with him individually.

66.    As she was afraid of Devany's temper and previous violent behavior, Mercer insisted that the meeting take place in the hallway of Sanofi's offices, where others would be present and security cameras were positioned.

67.    During his meeting with Mercer, he demanded that she tell him what was "wrong" with Kohn, but not feeling comfortable discussing Kohn's personal matters with Devany, Mercer shifted the discussion to female Sanofi and HH Global employees' fears of being castigated and harassed by his violent behavior.  After being reduced to tears, Mercer ended the discussion and returned to her desk.

68.    Devany then met with Kohn and, after only a few minutes, Mercer saw Kohn rush back to her desk and pick up the phone to make a call.  Devany followed Kohn and irately demanded that she hang up the phone and speak with him about her call to Tamburello-Agar.  When Kohn calmly told Devany that she was on the phone and that he needed to wait, Devany began yelling at her to tell him who she was speaking to.  Mercer later learned that Kohn had been on the phone with Berman, who, upon information and belief, heard the entire confrontation between Devany and Kohn.

69.     After almost 2 months without response from HH Global to Mercer's initial complaints, and with Devany's harassment only worsening, Mercer contacted Berman and Suastegui again on September 15, 2015, in hopes of some intervention.

70.     Berman requested that Mercer and Kohn provide written accounts of their encounters with Devany, which Mercer sent to Berman by e-mail on September 22, 2015.

71.     In a 7-page narrative regarding the situation, Mercer described the hostile work environment that Devany created, as well as his overall discriminatory conduct, and also detailed specific incidents of Devany harassing and bullying her, Kohn, Szych and Lewnes.

72.     Mercer's cover e-mail to Berman also expressed Mercer's fear that HH Global and/or Devany would retaliate against her for making this complaint, which Berman later assured would not happen.

73.     On October 1, 2015, Berman conducted in-person meetings at Sanofi with each member of HH Global's on-site team to investigate the various claims against Devany.

74.     The following week, during a telephone conference with Mercer and Kohn, Berman advised that the investigation was complete and that she would be working with Devany to improve his communication skills.

75.     During that call, Kohn specifically asked Berman what HH Global was doing to protect her and Mercer from Devany, especially since Devany knew that they had complained about his conduct.  Berman stated that HH Global would not tolerate his inappropriate behavior and that no employee should fear retaliation for bringing issues forward, but that it was not Mercer or Kohn's business to know how HH Global was specifically addressing the situation.

76.     Berman further stated that advising Mercer and Kohn to bring any future misconduct to her attention immediately.

77.     Upon information and belief, the incidents with Szych and Lewnes were also reported to Sanofi's human resources department, as well as to James Burnham, HH Global's Senior Vice President of Client Operations and Devany's direct supervisor, yet it soon became clear that nothing would change.

78.     In fact, Mercer documented a number of situations over weeks following Berman's visit and follow-up telephone conference, where Devany actively ignored Mercer's requests for support and refused to allow her to delegate work to other team members.

79.     Mercer also copied Berman on e-mails sent to Devany about redistributing workload among HH Global team-members, and documenting that Mercer was handling nearly twice the number of projects as other HH Global employees.

80.     Also documented, were reports to Mercer by colleagues and co-workers that Devany was actively searching for things she was doing wrong, all of which led Mercer to conclude that she was being targeted by Devany and that he would stop at nothing to undermine her viability as an HH Global employee.

81.     As Devany's communication with her and others deteriorated even further, Mercer became fearful and weary that his temper and violent tendencies would re-emerge if he continued to be left unchecked.

82.     Further fueling those fears and anxiety, Devany attempted to ensnare Mercer in a scheme to auspiciously direct a print project to a more expensive vendor.

83.     Specifically, after Mercer already notified the Sanofi brand manager of pricing and a production schedule that served the brand manager's timeline, Devany directed her to retract the quote and award the print project to his preferred printer.  Devany further instructed Mercer to tell the brand manager that she (*i.e.*, Mercer) made a mistake and would need to raise the price, all the while, "play[ing] up the fact" that HH Global was somehow still saving Sanofi money.

2006.001_MWLLP-21-4842 v1.0

84.    Knowing this was unethical--potentially in violation of Sanofi's Code of Ethics--and believing it to also be collusive and illegal, Mercer refused to become involved.

85.    As a result, Devany approached the brand manager directly and "sold" his scheme; then, when his preferred vendor failed to deliver the project on time, he attempted to blame Mercer, suggesting that she failed to notify the vendor of the correct deadline.

86.    Mercer also learned that Sanofi's printers were being required to pay a substantial annual fee to HH Global in order to continue receiving work from Sanofi through HH Global.

87.    Overworked and deprived of access to any support, Mercer continued to be a model, dedicated HH Global employee, working over 65 hours per week to make sure that no project was left unattended.

88.    During that time, Mercer was a consistent high-performer in the department--the highest quality and volume of work--which was consistently recognized in HH Global's own monthly reports, and continued to be known by her Sanofi colleagues as the "go-to" person for print production services.

89.    In fact, on October 20, 2015, Mercer even told Devany about a compliment received that day from a launch-brand manager, thanking her for being so helpful and proactive during the critical, initial marketing campaign.

90.    On October 22, 2015, HH Global's monthly report was released, yet again confirming Mercer's exceptional productivity and that she outperformed other HH Global employees.

91.    However, only 4 days later--October 26, 2015--Mercer was called into a meeting with Devany and, while Berman listened over the phone, was terminated without any reason given.

92.    Subsequently, HH Global stated that the reason for Mercer's termination was poor performance, and that Tamburello-Agar actually requested that Mercer be removed from Sanofi's account (despite previously stating to Mercer that she had no influence over HH Global).

93.     Shortly after notifying HH Global and Sanofi that she intended to pursue legal action against them as a result of her termination, Devany abruptly left HH Global for "personal reasons".

94.     Upon information and belief, Mercer's position at HH Global--Senior Production Services Manager--was filled by a younger, male individual.

95.     In May 2016, Mercer filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia*, that she had been subjected to a hostile work environment, workplace discrimination and retaliatory discharge.

96.     The EEOC investigated Mercer's charges and, on March 1, 2017, issued a notice stating that it was unable to conclude whether or not HH Global violated Federal law, and advising Mercer of her right to file a lawsuit within 90 days thereof.

**<u>First Count</u>**
**Violation of 29 U.S.C. §§ 621 *et seq*. (Age Discrimination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

97.     Mercer repeats the allegations set forth in Paragraphs 1 through 96 above as though fully set forth at length herein.

98.     Under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA"), it is unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to [his/her] compensation, terms, conditions, or privileges of employment, because of such individual's age," as well as to "to limit … employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [his/her] status as an employee, because of such individual's age." 29 U.S.C. § 623(a).

99.     Mercer is a protected individual under the ADEA. *See* 29 U.S.C. § 631.

100.    Although HH Global maintains that it terminated Mercer due to poor performance and because Sanofi (through Tamburello-Agar) requested that she be removed from its account, Mercer

was actually terminated, *inter alia*, because a younger worker could be hired to replace her likely at a lower salary.

101.   Upon information and belief, Mercer's position was filled with a newly-hired, younger, male employee, who receives a lower salary.

102.   To date, Mercer has been unable to secure other employment.

103.   Defendants' respective conduct constitutes age discrimination in violation of the ADEA.

**Second Count**
**Violation of 42 U.S.C. §§ 2000e et seq. (Sex/Gender Discrimination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

104.   Mercer repeats the allegations set forth in Paragraphs 1 through 103 above as though fully set forth at length herein.

105.   Federal civil rights statutes make it unlawful for an employer to, "discharge any individual, or otherwise to discriminate against any individual with respect to [that individual's] compensation, terms, conditions, or privileges of employment, because of such individual's … sex … ." 42 U.S.C. § 2000e-2(a)(1).

106.   Throughout the course of Mercer's employment with HH Global, Devany treated female HH Global employees, including Mercer, as well as female Sanofi employees, differently than male employees.

107.   In particular, Devany imposed arbitrary standards on HH Global's female employees only and publicly admonished and demeaned HH Global and Sanofi's female employees during the workday, in many instances, becoming physically aggressive towards these employees without any provocation.

mizrahiwarren

2006.001_MWLLP-21-4842 v1.0

108.   Sanofi's Global Code of Ethics ("Sanofi Ethics Code") provides that:

> US-based members of the Sanofi Group are committed to providing a work environment that is free from harassment and intimidation on the basis of … sex … or any other characteristic prohibited by law. Employees and contractors are prohibited from acting in ways that could be construed as harassment or that could create a hostile, intimidating, or demeaning environment for other employees … contractors or others with whom we interact in connection with our business.
>
> Harassment includes, but is not limited to, slurs or jokes, as well as abusive, demeaning, or derogatory comments, made about or to anyone … .
>
> The focus of our commitment to providing a harassment free work environment is on the effect of an individual's action, not the intent. Thus, if the actions of an employee or contractor have the effect of intimidating or demeaning others, it may be a violation of this Code, even if the employee or contractor believes he or she was "just kidding around" or "didn't mean any harm."
>
> Any employee or contractor who believes that he or she has been subjected to, or has witnessed or been informed of, actions that may violate this section of the Code or any Human Resources policy should promptly bring the matter to the Company's attention so that the Company may investigate the matter and take corrective action where appropriate.  Employees and contractors can report any of these matters as described in the Reporting section of this Code.  As with all other such matters, there will be no retaliation against anyone for raising any concerns about possible violations of this section of the Code. Those who raise such concerns will be treated with courtesy and can be assured that the matter will be handled with discretion.

109.   The Sanofi Ethics Code further states that, "if a situation arises in which the proper course of conduct is not clear, you should consult your manager (if you are a contractor, report the matter to the person at the Company with whom you are working) … ."

110.   In accordance with the Sanofi Ethics Code, Mercer and others reported Devany's conduct to Tamburello-Agar, who refused to become involved.

111.   Upon information and belief, Sanofi's Human Resources department was also made aware of Devany's conduct, yet did not intervene on behalf of Sanofi or HH Global employees.

mizrahiwarren

16

112.  Mercer and others also reported Devany's conduct to HH Global's human resources representatives, Berman and Suastegui.

113.  Berman investigated the claims against Devany, and advised Mercer that HH Global did not condone the alleged conduct and would counsel Devany to remediate his behavior.

114.  Notwithstanding Berman's supposed intervention, Devany continued to treat Mercer differently than other employees and prevented her from performing her duties by imposing arbitrary limitations on her.

115.  Devany's conduct, which were implicitly and overtly condoned by Defendants through their respective failures to intervene, address, correct and protect Mercer and other female employees/contractors from said conduct, constitutes discrimination in violation of 42 U.S.C. § 2000e-2 based upon gender.

### Third Count
**Violation of 42 U.S.C. §§ 2000e *et seq.* (Hostile Work Environment)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

116.  Mercer repeats the allegations set forth in Paragraphs 1 through 115 above as though fully set forth at length herein.

117.  Under 42 U.S.C. §§ 2000e *et seq.*, employers are prohibited from harassing employees and from creating hostile working environments for their employees.

118.  Additionally, the Sanofi Ethics Code prohibits the creation and/or facilitation of hostile work environments for Sanofi employees and/or contractors.

119.  Through his verbal denigration of female HH Global and Sanofi employees, including Mercer, and his physically aggressive behavior towards these individuals, Devany created a hostile work environment.

120.  Despite complaints by Mercer and others, to Sanofi and HH Global, Devany continued to foster a hostile work environment for HH Global and Sanofi employees, in violation of 42 U.S.C. §§ 2000e *et seq.*

## Fourth Count
**Violation of 42 U.S.C. §§ 2000e *et seq.* (Retaliation/Wrongful Termination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

121.  Mercer repeats the allegations set forth in Paragraphs 1 through 120 above as though fully set forth at length herein.

122.  Pursuant to 42 U.S.C. §§ 2000e *et seq.*, "[i]t shall be an unlawful employment practice for an employer to discriminate against any … employees … because [the employee] has opposed any practice made an unlawful employment practice by this title … ." 42 U.S.C. § 2000e-3(a).

123.  The Sanofi Ethics Code also states that individuals reporting discriminatory and/or harassing conduct will not be subject to retaliation, providing that:

> Individuals who report suspected violations of this Code will not be retaliated against for doing so.  No employee or contractor may retaliate against any person for reporting in good faith any inappropriate behavior or a matter under this Code or for cooperating in an investigation of any complaint.  Managers are expected to demonstrate their commitment to compliance by maintaining a work environment where open discussion of ethical, policy or conduct, questions and concerns is encouraged and expected without fear of retaliation.

124.  Mercer and others reported Devany's discriminatory and harassing conduct to HH Global and Sanofi, actively seeking intervention and protection against further discriminatory treatment and harassment.

125.  When Mercer reported Devany's conduct to HH Global, Berman assured her that she would not be retaliated against, and was told to report any future incidents to Berman directly.

mizrahiwarren

126.   After Berman's investigation was concluded, and Mercer was advised that Devany would be counselled regarding his conduct, Devany began looking for ways to portray Mercer's performance negatively and created arbitrary obstacles to prevent her from performing her job duties satisfactorily.

127.   Devany overloaded Mercer with work and prevented her from delegating tasks to subordinates as she was previously able to do, in an attempt to destabilize her exceptional performance record.

128.   Mercer also received reports from coworkers that Devany was actively searching for errors in Mercer's work and demanded that her coworkers immediately report any errors Mercer made to him, no matter how big or small.

129.   On one occasion, after Mercer already notified a Sanofi brand manager of pricing and a production schedule that served the brand manager's timeline, Devany directed her to retract the quote and award the print project to his preferred printer.  Devany further instructed Mercer to tell the brand manager that she (*i.e.*, Mercer) made a mistake and would need to raise the price, all the while, "play[ing] up the fact" that HH Global was somehow still saving Sanofi money.

130.   From her training, Mercer was aware that the Sanofi Ethics Code prohibited such collusive conduct.

131.   Specifically, the Sanofi Ethics Code states, *inter alia*, that:

> As an employee or contractor of a US-based member of the Sanofi Group, you must not accept any gift or gratuity in connection with your position at the Company unless it is given solely as a matter of custom or courtesy and has a value of US $100 or less.  If a gift does not meet these guidelines, you must make every effort to politely refuse or return it, explaining that Company policy prevents you from accepting it.  In addition, you should not accept multiple gifts from any business contact that cumulatively exceed the value of US $100 in any 12 month period. … Some functional areas such as Procurement may have additional restrictions on accepting gifts and business entertainment due to the nature of their function.  It is your responsibility to inquire about policies and procedures applicable in your area and to seek

mizrahiwarren℠

2006.001_MWLLP-21-4842 v1.0

advice when there is any question as to the appropriateness of a gift or business entertainment.

. . . .

In addition to the issues listed in the Code of Ethics, US-based members of the Sanofi Group prohibit: agreements or discussions to boycott customers or suppliers; to exclude competitors or restrict trade in the marketplace; or to require a customer to buy a product that it does not want as a condition of a license or sale of a different product ("tying" of two products together).

US-based members of the Sanofi Group also do not engage in discussions or agreements regarding price fixing, stabilization or discrimination; concerning a customer's resale prices or terms; or that require a vendor or supplier to purchase products from US-based members of the Sanofi Group as a condition of a Sanofi Group member purchasing products or services from that person or entity.

132.  Not knowing Devany's motivation for selecting his preferred vendor, and believing that his conduct not only violated the Sanofi Ethics Code, but was also collusive and illegal, Mercer refused to become involved.

133.  As a result, Devany approached the brand manager directly and "sold" his scheme; then, when his preferred vendor failed to deliver the project on time, he attempted to blame Mercer, suggesting that she failed to notify the vendor of the correct deadline.

134.  Despite Devany's attempts to damage Mercer's reputation and impede her work performance, Mercer worked longer hours to ensure that her work was complete and correct.

135.  In fact, Mercer was repeatedly commended for her work by Sanofi brand managers, and HH Global's reports consistently noted her outstanding performance.

136.  Notwithstanding, a mere 4 days after HH Global issued a report demonstrating Mercer's exceptional productivity, Devany and Berman terminated Mercer due to alleged poor performance.

137.  HH Global also stated, after-the-fact, that Sanofi (through Tamburello-Agar) requested Mercer be removed from the Sanofi account.

138.  Based upon the foregoing, Defendants, through their individual and/or concerted actions, violated 42 U.S.C. §§ 2000e *et seq.*, by discharging Mercer, or causing Mercer to be

mizrahiwarren

discharged, from her employment with HH Global, in retaliation for her complaints regarding discrimination and harassment, and for her refusal to participate in unethical and/or illegal conduct.

**Fifth Count**
**Violation of *N.J.S.A.* 10:5-1 *et seq.* (Age Discrimination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

139.   Mercer repeats the allegations set forth in Paragraphs 1 through 138 above as though fully set forth at length herein.

140.   Under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 *et seq.* ("NJLAD"), it is unlawful for an employer, "because of the … age … of any individual … to discharge or … to discriminate against such individual in compensation or in terms, conditions or privileges of employment … ." *N.J.S.A.* 10:5-12(a).

141.   Although HH Global maintains that it terminated Mercer due to poor performance and because Sanofi (through Tamburello-Agar) requested that she be removed from its account, Mercer was actually terminated, *inter alia*, because a younger worker could be hired to replace her likely at a lower salary.

142.   Upon information and belief, Mercer's position was filled with a newly-hired, younger, male employee, who receives a lower salary.

143.   To date, Mercer has been unable to secure other employment.

144.   Defendants' respective conduct constitutes age discrimination in violation of the NJLAD.

**Sixth Count**
**Violation of *N.J.S.A.* 10:5-1 *et seq.* (Sex/Gender Discrimination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

145.   Mercer repeats the allegations set forth in Paragraphs 1 through 144 above as though fully set forth at length herein.

2006.001_MWLLP-21-4842 v1.0

146.  The NJLAD prohibits employers, "because of the … sex … of any individual … to discharge or … to discriminate against such individual in compensation or in terms, conditions or privileges of employment … ." *N.J.S.A.* 10:5-12(a).

147.  Throughout the course of Mercer's employment with HH Global, Devany treated female HH Global employees, including Mercer, as well as female Sanofi employees, differently than male employees.

148.  In particular, Devany imposed arbitrary standards on HH Global's female employees only and publicly admonished and demeaned HH Global and Sanofi's female employees during the workday, in many instances, becoming physically aggressive towards these employees without any provocation.

149.  Sanofi's Global Code of Ethics ("Sanofi Ethics Code") provides that:

> US-based members of the Sanofi Group are committed to providing a work environment that is free from harassment and intimidation on the basis of … sex … or any other characteristic prohibited by law. Employees and contractors are prohibited from acting in ways that could be construed as harassment or that could create a hostile, intimidating, or demeaning environment for other employees … contractors or others with whom we interact in connection with our business.

> Harassment includes, but is not limited to, slurs or jokes, as well as abusive, demeaning, or derogatory comments, made about or to anyone … .

> The focus of our commitment to providing a harassment free work environment is on the effect of an individual's action, not the intent. Thus, if the actions of an employee or contractor have the effect of intimidating or demeaning others, it may be a violation of this Code, even if the employee or contractor believes he or she was "just kidding around" or "didn't mean any harm."

> Any employee or contractor who believes that he or she has been subjected to, or has witnessed or been informed of, actions that may violate this section of the Code or any Human Resources policy should promptly bring the matter to the Company's attention so that the Company may investigate the matter and take corrective action where appropriate.  Employees and contractors can report any of these matters as described in the Reporting section of this Code.  As with all

mizrahiwarren.

other such matters, there will be no retaliation against anyone for raising any concerns about possible violations of this section of the Code. Those who raise such concerns will be treated with courtesy and can be assured that the matter will be handled with discretion.

150.   The Sanofi Ethics Code further states that, "if a situation arises in which the proper course of conduct is not clear, you should consult your manager (if you are a contractor, report the matter to the person at the Company with whom you are working) … ."

151.   In accordance with the Sanofi Ethics Code, Mercer and others reported Devany's conduct to Tamburello-Agar, who refused to become involved.

152.   Upon information and belief, Sanofi's Human Resources department was also made aware of Devany's conduct, yet did not intervene on behalf of Sanofi or HH Global employees.

153.   Mercer and others also reported Devany's conduct to HH Global's human resources representatives, Berman and Suastegui.

154.   Berman investigated the claims against Devany, and advised Mercer that HH Global did not condone the alleged conduct and would counsel Devany to remediate his behavior.

155.   Notwithstanding Berman's supposed intervention, Devany continued to treat Mercer differently than other employees and prevented her from performing her duties by imposing arbitrary limitations on her.

156.   Devany's conduct, which were implicitly and overtly condoned by Defendants through their respective failures to intervene, address, correct and protect Mercer and other female employees/contractors from said conduct, constitutes discrimination in violation of the NJLAD based upon gender.

mizrahiwarren

2006.001_MWLLP-21-4842 v1.0

**Seventh Count**
**Violation of *N.J.S.A.* 10:5-1 *et seq.* (Hostile Work Environment)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

157.   Mercer repeats the allegations set forth in Paragraphs 1 through 156 above as though fully set forth at length herein.

158.   Under the NJLAD and the New Jersey Supreme Court's ruling in *Lehman v. Toys R Us Inc.*, 132 N.J. 587 (1993), employers are prohibited from harassing employees and from creating hostile working environments for their employees.

159.   Additionally, the Sanofi Ethics Code prohibits the creation and/or facilitation of hostile work environments for Sanofi employees and/or contractors.

160.   Through his verbal denigration of female HH Global and Sanofi employees, including Mercer, and his physically aggressive behavior towards these individuals, Devany created a hostile work environment.

161.   Despite complaints by Mercer and others, to Sanofi and HH Global, Devany continued to foster a hostile work environment for HH Global and Sanofi employees, in violation of the NJLAD and the Court's ruling in *Lehman*.

**Eighth Count**
**Violation of *N.J.S.A.* 10:5-1 *et seq.* (Retaliation/Wrongful Termination)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

162.   Mercer repeats the allegations set forth in Paragraphs 1 through 161 above as though fully set forth at length herein.

163.   Pursuant to the NJLAD, it is unlawful, "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act … or to

2006.001_MWLLP-21-4842 v1.0

mizrahiwarren℠

coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of … any right granted or protected by this act." *N.J.S.A.* 10:5-12(d).

164. The Sanofi Ethics Code also states that individuals reporting discriminatory and/or harassing conduct will not be subject to retaliation, providing that:

> Individuals who report suspected violations of this Code will not be retaliated against for doing so. No employee or contractor may retaliate against any person for reporting in good faith any inappropriate behavior or a matter under this Code or for cooperating in an investigation of any complaint. Managers are expected to demonstrate their commitment to compliance by maintaining a work environment where open discussion of ethical, policy or conduct, questions and concerns is encouraged and expected without fear of retaliation.

165. Mercer and others reported Devany's discriminatory and harassing conduct to HH Global and Sanofi, actively seeking intervention and protection against further discriminatory treatment and harassment.

166. When Mercer reported Devany's conduct to HH Global, Berman assured her that she would not be retaliated against, and was told to report any future incidents to Berman directly.

167. After Berman's investigation was concluded, and Mercer was advised that Devany would be counselled regarding his conduct, Devany began looking for ways to portray Mercer's performance negatively and created arbitrary obstacles to prevent her from performing her job duties satisfactorily.

168. Devany overloaded Mercer with work and prevented her from delegating tasks to subordinates as she was previously able to do, in an attempt to destabilize her exceptional performance record.

169. Mercer also received reports from coworkers that Devany was actively searching for errors in Mercer's work and demanded that her coworkers immediately report any errors Mercer made to him, no matter how big or small.

2006.001_MWLLP-21-4842 v1.0

170.   On one occasion, after Mercer already notified a Sanofi brand manager of pricing and a production schedule that served the brand manager's timeline, Devany directed her to retract the quote and award the print project to his preferred printer.  Devany further instructed Mercer to tell the brand manager that she (*i.e.*, Mercer) made a mistake and would need to raise the price, all the while, "play[ing] up the fact" that HH Global was somehow still saving Sanofi money.

171.   From her training, Mercer was aware that the Sanofi Ethics Code prohibited such collusive conduct.

172.   Specifically, the Sanofi Ethics Code states, *inter alia*, that:

> As an employee or contractor of a US-based member of the Sanofi Group, you must not accept any gift or gratuity in connection with your position at the Company unless it is given solely as a matter of custom or courtesy and has a value of US $100 or less.  If a gift does not meet these guidelines, you must make every effort to politely refuse or return it, explaining that Company policy prevents you from accepting it.  In addition, you should not accept multiple gifts from any business contact that cumulatively exceed the value of US $100 in any 12 month period. … Some functional areas such as Procurement may have additional restrictions on accepting gifts and business entertainment due to the nature of their function.  It is your responsibility to inquire about policies and procedures applicable in your area and to seek advice when there is any question as to the appropriateness of a gift or business entertainment.
>          . . . .
> In addition to the issues listed in the Code of Ethics, US-based members of the Sanofi Group prohibit: agreements or discussions to boycott customers or suppliers; to exclude competitors or restrict trade in the marketplace; or to require a customer to buy a product that it does not want as a condition of a license or sale of a different product ("tying" of two products together).
>
> US-based members of the Sanofi Group also do not engage in discussions or agreements regarding price fixing, stabilization or discrimination; concerning a customer's resale prices or terms; or that require a vendor or supplier to purchase products from US-based members of the Sanofi Group as a condition of a Sanofi Group member purchasing products or services from that person or entity.

2006.001_MWLLP-21-4842 v1.0

173.  Not knowing Devany's motivation for selecting his preferred vendor, and believing that his conduct not only violated the Sanofi Ethics Code, but was also collusive and illegal, Mercer refused to become involved.

174.  As a result, Devany approached the brand manager directly and "sold" his scheme; then, when his preferred vendor failed to deliver the project on time, he attempted to blame Mercer, suggesting that she failed to notify the vendor of the correct deadline.

175.  Despite Devany's attempts to damage Mercer's reputation and impede her work performance, Mercer worked longer hours to ensure that her work was complete and correct.

176.  In fact, Mercer was repeatedly commended for her work by Sanofi brand managers, and HH Global's reports consistently noted her outstanding performance.

177.  Notwithstanding, a mere 4 days after HH Global issued a report demonstrating Mercer's exceptional productivity, Devany and Berman terminated Mercer due to alleged poor performance.

178.  HH Global also stated, after-the-fact, that Sanofi (through Tamburello-Agar) requested Mercer be removed from the Sanofi account.

179.  Based upon the foregoing, Defendants, through their individual and/or concerted actions, violated the NJLAD by discharging Mercer, or causing Mercer to be discharged, from her employment with HH Global, in retaliation for her complaints regarding discrimination and harassment, and for her refusal to participate in unethical and/or illegal conduct.

**Ninth Count**
**Violation of *N.J.S.A.* 34:19-1 *et seq*. (Retaliatory Discharge)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

180.  Mercer repeats the allegations set forth in Paragraphs 1 through 179 above as though fully set forth at length herein.

mizrahiwarren

181.   Under the New Jersey Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 *et seq.* ("CEPA"), employers are prohibited from retaliating against an employee because he/she:

> a.  Discloses, or threatens to disclose … an activity, policy or practice … that the employee reasonably believes:
>
> > (1)   is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any … client, … customer, … ; or
> >
> > (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any … client, … customer … .
> >
> > . . . .
>
> c.  Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> > (1)   is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any … client, … customer … ; [or]
> >
> > (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any … client, … customer … .

[*N.J.S.A.* 34:19-3.]

182.   Defendants, through their individual and/or concerted actions, violated CEPA by discharging Mercer, or causing Mercer to be discharged, from her employment with HH Global, in retaliation for her complaints regarding discrimination and harassment, and for her refusal to participate in unethical and/or illegal conduct.

### Tenth Count
### Breach of Implied Covenant of Good Faith and Fair Dealing
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

183.   Mercer repeats the allegations set forth in Paragraphs 1 through 182 above as though fully set forth at length herein.

184.   Defendants, through their individual and/or concerted actions, breached an implied covenant of good faith and fair dealing by: (1) discriminating against Mercer and/or treating Mercer

mizrahiwarren

unfairly based upon her age and/or sex/gender; (2) allowing Devany to create a hostile work environment through which he repeatedly harassed Mercer and others; (3) failing to protect Mercer from discrimination and/or harassment by Devany; (4) retaliating against Mercer for her complaints regarding discrimination and harassment, and for her refusal to participate in unethical and/or illegal conduct; and/or (5) discharging Mercer, or causing Mercer to be discharged, from her employment with HH Global, in retaliation for her complaints regarding discrimination and harassment, and for her refusal to participate in unethical and/or illegal conduct.

## Eleventh Count
### Negligent Hiring/Retention
against Defendants HH Global Limited,
HH Associates Limited and HH Associates U.S. Inc.

185.   Mercer repeats the allegations set forth in Paragraphs 1 through 184 above as though fully set forth at length herein.

186.   Based upon prior instances of discrimination and harassment by Devany in other assignments, HH Global had actual or constructive knowledge of Devany's attitudes towards women and aggressive, hostile predispositions.

187.   Additionally, HH Global could have reasonably foreseen that Devany's attitudes and conduct created a risk of discrimination and/or harassment of other HH Global employees, including Mercer.

188.   Notwithstanding HH Global's actual or constructive knowledge of Devany's conduct in prior assignments and the foreseeable risk that his conduct would continue in future assignments, HH Global still appointed Devany as Client Services Manager for the Sanofi account.

189.   Indeed, Mercer was discriminated against by Devany, subjected to a hostile work environment and, subsequently, unfairly discharged from her employment with HH Global in retaliation

mizrahiwarren

for her complaints regarding discrimination and harassment against Devany, and for her refusal to participate in unethical and/or illegal conduct with Devany.

190.   HH Global's negligence in appointing Devany as Client Services Manager for the Sanofi account directly resulted in his discriminatory and harassing treatment of Mercer and other female HH Global and Sanofi employees.

191.   HH Global's upper management, including Berman and Senior Vice President of Client Operations James Burnham, was aware of Devany's conduct toward Mercer and others, yet demonstrated willful indifference to such conduct and actively participated in such conduct by unjustly discharging Mercer (and/or allowing Mercer to be discharged) from her employment with HH Global.

**Twelfth Count**
**Negligent Supervision**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

192.   Mercer repeats the allegations set forth in Paragraphs 1 through 191 above as though fully set forth at length herein.

193.   Based upon reports to their respective human resources departments, both HH Global and Sanofi were aware of Devany's discriminatory and harassing conduct, as well as the existence of a hostile work environment that adversely affected female HH Global and Sanofi employees.

194.   Additionally, upon information and belief, Sanofi was aware that Tamburello-Agar willfully disregarded Devany's conduct by refusing to become involved or further escalate the issue to other Sanofi departments, which violated Sanofi's own policies as set forth in the Sanofi Ethics Code.

195.   Notwithstanding their respective duties to supervise Devany and Tamburello-Agar's conduct and ensure their compliance with the law and the Sanofi Ethics Code, HH Global and Sanofi both failed to adequately supervise Devany and Tamburello-Agar.

mizrahiwarren

196.   As a direct result of HH Global and Sanofi's negligent supervision of their employees and/or contractors, Mercer was subjected to discriminatory treatment, a hostile work environment and was, subsequently, unfairly discharged from her employment with HH Global through Devany and Tamburello-Agar's concerted actions.

**Thirteenth Count**
**Tortious Interference (Noncompetition Agreement)**
against Defendants HH Global Limited,
HH Associates Limited and HH Associates U.S. Inc.

197.   Mercer repeats the allegations set forth in Paragraphs 1 through 196 above as though fully set forth at length herein.

198.   The Employment Agreement between Mercer and HH Global contained a provision against noncompetition ("Non-Compete Clause"), which states that, for a period of 12 months following any termination of her employment with HH Global, Mercer was prohibited from becoming, "associated with any entity, whether as principal, partner, employee, consultant or shareholder … that engages in … an activity that is in competition with a business and/or service that [HH Global] provided or planned to provide while [Mercer] was employed by [HH Global] … [including] employment by a client either directly or indirectly."

199.   The Non-Compete Clause unduly restricted Mercer's ability to obtain employment for 12 months following her discharge from HH Global, since it contained no geographical limitations.

200.   The Non-Compete Clause also unconscionably prevented Mercer from obtaining another position in the small, close-knit print procurement field (in which she has been employed for over 25 years) for 12 months following her discharge from HH Global, based upon HH Global's contracts with a number of organizations in the pharmaceutical and print procurement industries.

201.  As a result of the unreasonably restrictive Non-Compete Clause, Mercer was unable to take advantage of other, potentially-lucrative employment opportunities in the print procurement industry.

**Fourteenth Count**
**Tortious Interference (Unemployment Benefits)**
against Defendants HH Global Limited,
HH Associates Limited and HH Associates U.S. Inc.

202.  Mercer repeats the allegations set forth in Paragraphs 1 through 201 above as though fully set forth at length herein.

203.  To be eligible for unemployment benefits under the New Jersey Unemployment Compensation Law, *N.J.S.A.* 43:21-1 *et seq.* ("NJUCL"), an individual must have established at least 20 base weeks[1] (*i.e.*, approximately 4.5 months) of employment during the year in which benefits are being claimed. *N.J.S.A.* 43:21-4(e)(4).

204.  The NJUCL also requires an individual to be, "able to work, and … available for work, and … demonstrated to be actively seeking work," in order to receive unemployment benefits. *N.J.S.A.* 43:21-4(c)(1).

205.  Mercer was discharged from her employment with HH Global on October 26, 2015, approximately 17.5 weeks after her start date and approximately 2.5 weeks short of the minimum number of weeks required to collect unemployment benefits.

206.  HH Global engineered the timing of Mercer's discharge in order to avoid liability for her unemployment benefits through the New Jersey Department of Labor and Workforce Development.

---

[1] For purposes of the NJUCL, "base week" means, "any calendar week during which the individual earned in employment from an employer remuneration not less than an amount 20 times the minimum wage in effect … on October 1 of the calendar year preceding the calendar year in which the benefit year commences … ." *N.J.S.A.* 43:21-19(t)(3).

2006.001_MWLLP-21-4842 v1.0

mizrahiwarren

207.  Additionally, even if Mercer had established 20 weeks of employment with HH Global, the expansiveness of the Non-Compete Clause prevented her from being available to work and also prevented her from actively seeking work.

208.  As a result of HH Global's intentionally-timed discharge, Mercer was ineligible for and unable to collect unemployment benefits.

## Fifteenth Count
### Tortious Interference (Prospective Employment Opportunities)
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

209.  Mercer repeats the allegations set forth in Paragraphs 1 through 208 above as though fully set forth at length herein.

210.  With its expansion into the print procurement field in the United States, HH Global has become the primary company providing outsourced print procurement services to various other industries, with a primary focus on pharmaceuticals.

211.  As part of providing its services, HH Global has developed extensive relationships with print vendors, which HH Global contracts with to provide print production services to its clients.

212.  Through these relationships, HH Global has engaged in a practice of controlling print vendors in a number of ways, including without limitation, requiring these print vendors to pay a substantial annual fee to HH Global to be considered for print production subcontracts and preventing these print vendors from providing services to HH Global's competitors.

213.  During her time working for HH Global, Mercer observed these practices being implemented with the print vendors used at Sanofi.

214.  By way of example, while Mercer was working for HH Global, Devany directed Mercer to channel a specific print project to his preferred print vendor, despite the fact that the original vendor Mercer selected submitted a lower-priced proposal.

215.   While Mercer refused to engage in these ostensibly illegal practices at Devany's behest, Devany overrode her vendor selection and, nonetheless, awarded the project to his preferred vendor.

216.   The Sanofi Ethics Code specifically provides that:

> US-based members of the Sanofi Group also do not engage in discussions or agreements regarding price fixing, stabilization or discrimination; concerning a customer's resale prices or terms; or that require a vendor or supplier to purchase products from US-based members of the Sanofi Group as a condition of a Sanofi Group member purchasing products or services from that person or entity.

217.   Upon information and belief, despite prohibiting such conduct, Sanofi (through Tamburello-Agar) was actually or constructively aware of HH Global's restrictive practices, and participated in and/or condoned--directly or implicitly--such activities.

218.   Mercer has been employed in the print procurement industry since 1983, with a particular focus on the pharmaceutical sector, and during that time has established strong contacts and working relationships with several print vendors used by HH Global.

219.   Subsequent to being discharged from her employment with HH Global, these print vendors have refused to have any professional involvement with Mercer due to the restrictions imposed upon them by HH Global and/or Sanofi and out of fear that HH Global and/or Sanofi will retaliate by refusing to assign them any print production subcontracts.

220.   As a result, Mercer is effectively unable to use these relationships in another position or an independent business venture in the print procurement field.

221.   By controlling these print vendors' abilities to receive work, HH Global and/or Sanofi was/were aware, or it was reasonably foreseeable, that Mercer's relationships with these vendors would be compromised when she was discharged from her employment with HH Global, and that this would effectively prevent her from finding other employment or starting her own business venture in the print procurement field.

mizrahiwarren

222.   Indeed, since being discharged from her employment with HH Global, Mercer has been unable to obtain another position or start her own business venture in the print procurement field.

**Sixteenth Count**
**Violation of 15 U.S.C. §§ 1 *et seq.* (Sherman Act)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

223.   Mercer repeats the allegations set forth in Paragraphs 1 through 222 above as though fully set forth at length herein.

224.   Pursuant to the Sherman Act, 15 U.S.C. §§ 1 *et seq.* ("Sherman Act"), "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States … is hereby declared to be illegal." 15 U.S.C. § 1.

225.   Furthermore, the Sherman Act makes it unlawful for any person or company to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States … ." 15 U.S.C. § 2.

226.   Additionally, the Sherman Act states that:

> any person who shall be injured in his [or her] business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant … is found or has an agent, without respect to the amount in controversy, and shall recover underline threefold the damages by him [or her] sustained, and the cost of suit, including a reasonable attorney's fee.

> [15 U.S.C. § 15(a) (emphasis added).]

227.   Through its restrictive practices with respect to print vendors (*i.e.*, direct control through demands for annual fees and through actual and/or implied exclusivity agreements), HH Global unlawfully restrains commerce in violation of the Sherman Act.

228.   With its knowledge of HH Global's restrictive practices (through Tamburello-Agar), Sanofi acted in concert with HH Global to restrain commerce through its treatment of print vendors.

mizrahiwarren

229.  As a direct result of HH Global and Sanofi's unlawful conduct, Mercer has been unable to benefit from contacts and working relationships with these print vendors, which she developed and maintained over the course of her 25+ year career in the print procurement industry.

**Seventeenth Count**
**Violation of 15 U.S.C. §§ 12 *et seq.* (Clayton Act)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

230.  Mercer repeats the allegations set forth in Paragraphs 1 through 229 above as though fully set forth at length herein.

231.  Under the Clayton Act, 15 U.S.C. §§ 12 *et seq.* ("Clayton Act"), it is unlawful for:

> [A]ny person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States … and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them … .

> [15 U.S.C. § 13(a).]

232.  The Clayton Act also makes it unlawful for, "any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

233.  Furthermore, under § 3 of the Clayton Act, it is unlawful for a person or company to enter into an express or implied exclusivity agreement regarding the sale or purchase of goods or commodities, "where the effect of … agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

2006.001_MWLLP-21-4842 v1.0

mizrahiwarren™

234.  Through its restrictive practices with respect to print vendors (*i.e.*, direct control through demands for annual fees and through actual and/or implied exclusivity agreements), HH Global unlawfully restrains competition and effectively creates a monopoly in the purchase of printed advertising materials for the pharmaceutical industry in violation of the Clayton Act.

235.  With its knowledge of HH Global's restrictive practices (through Tamburello-Agar), Sanofi acted in concert with HH Global to restrain competition and effectively allow HH Global to create a monopoly in the purchase of printed advertising materials for the pharmaceutical industry.

236.  As a direct result of HH Global and Sanofi's unlawful conduct, Mercer has been unable to benefit from contacts and working relationships with these print vendors, which she developed and maintained over the course of her 25+ year career in the print procurement industry.

**Eighteenth Count**
**Violation of 18 U.S.C. §§ 1961 *et seq.***
**(Racketeer Influenced and Corrupt Organizations Act)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC,
Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar

237.  Mercer repeats the allegations set forth in Paragraphs 1 through 236 above as though fully set forth at length herein.

238.  Under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("Federal RICO Act"), "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover <u>threefold</u> the damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee … ." 18 U.S.C. § 1964(c) (emphasis added).

239.  The Federal RICO Act provides that:

> (a)  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which such person has participated … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in

37

mizrahiwarren<sub>LLP</sub>

acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(b)  It shall be unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity … .

(d)  It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

[18 U.S.C. § 1962.]

240.  Under the Federal RICO Act, "racketeering activity" is defined as including, "any act or threat involving … extortion … ; … any act which is indictable under any of the following provisions of title 18, United States Code: … section 1951 (relating to interference with commerce … or extortion), section 1952 (relating to racketeering) … ." 18 U.S.C. § 1961(1)(A)-(B).

241.  HH Global, Sanofi, Devany and Tamburello-Agar are all "persons" as defined under the Federal RICO Act. *See* 18 U.S.C. § 1961(3).

242.  HH Global and Sanofi are also "enterprises" as defined under the Federal RICO Act. *See* 18 U.S.C. § 1961(4).

243.  On at least 2 occasions during the course of HH Global's service under its outsourcing agreement with Sanofi (*i.e.*, between July 2015 and the present), HH Global, either directly or through its employees, including Devany, unilaterally demanded substantial annual payments from its print vendors in exchange for the eligibility to receive print production subcontracts from HH Global and/or Sanofi.

244.  HH Global and its employees, including Devany, also imposed restrictions on print vendors that effectively prohibited them from providing print production services and goods to HH Global's competitors, through actual or implied exclusivity agreements.

245.  Upon information and belief, these practices were employed throughout HH Global's operations in the United States.

246.  HH Global's practice of extorting annual payments from print vendors and controlling print vendors' work for HH Global's competitors, unfairly restricts interstate commerce and impedes free competition among HH Global's competitors and former employees in violation of the Federal RICO Act.

247.  Through Tamburello-Agar, Sanofi was aware of HH Global's unlawful practices and directly and/or indirectly participated in and benefited from such unlawful practices.

248.  As a direct result of Defendants' unlawful conduct, Mercer has been unable to benefit from contacts and working relationships with these print vendors, which she developed and maintained over the course of her 25+ year career in the print procurement industry.

249.  In particular, due to these print vendors' fears of reprisal from HH Global for working with Mercer or any other potential competitor, Mercer has been and will continue to be unable to use her contacts and working relationships with these print vendors in any other position she obtains and/or any independent business venture she starts in the print procurement industry.

### Nineteenth Count
**Violation of *N.J.S.A.* 2C:41-1 *et seq.* (New Jersey Racketeering Law)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

250.  Mercer repeats the allegations set forth in Paragraphs 1 through 249 above as though fully set forth at length herein.

2006.001_MWLLP-21-4842 v1.0

251.   Under New Jersey Racketeering Law ("State RICO Act"), "[a]ny person damaged in his [or her] business or property by reason of a violation of *N.J.S.A.* 2C:41-2 may sue therefor in any appropriate court and shall recover <u>threefold</u> any damages he [or she] sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation." *N.J.S.A.* 2C:41-4(c) (emphasis added).

252.   The State RICO Act provides that:

> a.  It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which he has participated as a principal … to use or invest, directly or indirectly, any part of the income, or the proceeds of the income, in … operation of any enterprise which is engaged in or the activities of which affect trade or commerce.

> b.  It shall be unlawful for any person through a pattern of racketeering activity … to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in or activities of which affect trade or commerce.

> c.  It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity … .

> d.  It shall be unlawful for any person to conspire … to violate any of the provisions of this section.

> [*N.J.S.A.* 2C:41-2.]

253.   Under the State RICO Act, "racketeering activity" is defined as including extortion, as well as, "any conduct defined as 'racketeering activity' under [the Federal RICO Act]." *N.J.S.A.* 2C:41-1(a).

254.   HH Global, Sanofi, Devany and Tamburello-Agar are all "persons" as defined under the State RICO Act. *See N.J.S.A.* 2C:41-1(b).

255.   HH Global and Sanofi are also "enterprises" as defined under the State RICO Act. *See N.J.S.A.* 2C:41-1(c).

mizrahiwarren

256.  On at least 2 occasions during the course of HH Global's service under its outsourcing agreement with Sanofi (*i.e.*, between July 2015 and the present), HH Global, either directly or through its employees, including Devany, unilaterally demanded substantial annual payments from its print vendors in exchange for the eligibility to receive print production subcontracts from HH Global and/or Sanofi.

257.  HH Global and its employees, including Devany, also imposed restrictions on print vendors that effectively prohibited them from providing print production services and goods to HH Global's competitors, through actual or implied exclusivity agreements.

258.  Upon information and belief, these practices were employed throughout HH Global's operations in the State of New Jersey.

259.  HH Global's practice of extorting annual payments from print vendors and controlling print vendors' work for HH Global's competitors, unfairly restricts interstate commerce and impedes free competition among HH Global's competitors and former employees in violation of the State RICO Act.

260.  Through Tamburello-Agar, Sanofi was aware of HH Global's unlawful practices and directly and/or indirectly participated in and benefited from such unlawful practices.

261.  As a direct result of Defendants' unlawful conduct, Mercer has been unable to benefit from contacts and working relationships with these print vendors, which she developed and maintained over the course of her 25+ year career in the print procurement industry.

262.  In particular, due to these print vendors' fears of reprisal from HH Global for working with Mercer or any other potential competitor, Mercer has been and will continue to be unable to use her contacts and working relationships with these print vendors in any other position she obtains and/or any independent business venture she starts in the print procurement industry.

mizrahiwarren

**Twentieth Count**
**Violation of *N.J.S.A.* 56:9-1 *et seq*. (New Jersey Antitrust Act)**
against Defendants HH Global Limited, HH Associates Limited,
HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC
and Sanofi US Services Inc.

263.  Mercer repeats the allegations set forth in Paragraphs 1 through 262 above as though fully set forth at length herein.

264.  The New Jersey Antitrust Act, *N.J.S.A.* 56:9-1 *et seq.* ("Antitrust Act"), provides that, "[e]very contract … or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." *N.J.S.A.* 56:9-3.

265.  The Antitrust Act further provides that, "[i]t shall be unlawful for any person to monopolize, or attempt to monopolize, or to … conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State." *N.J.S.A.* 56:9-4.

266.  Additionally, the Antitrust Act states that, "[a]ny person who shall be injured in his [or her] business or property by reason of a violation of the provisions of this act may sue therefor and shall recover <u>threefold</u> the damages sustained by him [or her], together with reasonable attorneys' fees, filing fees and reasonable costs of suit." *N.J.S.A.* 56:9-12(a) (emphasis added).

267.  Through its restrictive practices with respect to print vendors (*i.e.*, direct control through demands for annual fees and through actual and/or implied exclusivity agreements), HH Global unlawfully restrains commerce in violation of the Sherman Act.

268.  With its knowledge of HH Global's restrictive practices (through Tamburello-Agar), Sanofi acted in concert with HH Global to restrain commerce through its treatment of print vendors.

269.  As a direct result of HH Global and Sanofi's unlawful conduct, Mercer has been unable to benefit from contacts and working relationships with these print vendors, which she developed and maintained over the course of her 25+ year career in the print procurement industry.

2006.001_MWLLP-21-4842 v1.0

**Wherefore,** Plaintiff Cheryl Mercer hereby demands Judgment against Defendants HH Global Limited, HH Associates Limited, HH Associates U.S. Inc., Sanofi S.A., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Michael Devany and Linda Tamburello-Agar, jointly and severally, for lost wages and benefits, other economic damages, punitive damages, attorney's fees and costs, and for any such other relief as the Court may deem equitable and just.

### Certification Pursuant to L.Civ.R. 11.2

All confidential personal identifiers have been redacted from documents now submitted to the Court, and will be redacted from all documents submitted in the future.  Furthermore, the causes alleged herein are not the subject of any other action pending in any Court or of a pending arbitration proceeding, and there is no other action or arbitration proceeding contemplated.  I hereby certify, under penalty of perjury, that the foregoing is true and correct.

### Demand for Trial by Jury Pursuant to Fed.R.Civ.P. 38(B)

In accordance with Fed.R.Civ.P. 38(b), Plaintiff Cheryl Mercer hereby demands a trial by jury on all issues so triable.

### Designation of Trial Counsel

Plaintiff Cheryl Mercer hereby designates Aaron Mizrahi, Esquire, as trial counsel in this action.


Dated:  May 12, 2017

 s/ Aaron Mizrahi

Aaron Mizrahi (AM7030)
Direct Dial 973.486.4972
Direct Facsimile 973.358.5853
amizrahi@mizrahiwarren.com

**MIZRAHI WARREN LLP**
*Attorneys for Plaintiff Cheryl Mercer*
The Centre at Park Avenue
523 Park Avenue, Third Floor
Orange, New Jersey 07050
Telephone 973.685.5444
Facsimile 973.685.3936

mizrahiwarren LLP

2006.001_MWLLP-21-4842 v1.0